UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
CAROL LOPEZ,                                                       :
:
Plaintiff,                     :
:                    20-cv-2502 (LJL)
-v-                            :
:                    OPINION AND ORDER
CITY OF NEW YORK, POLICE OFFICER ANTHONY :
SALINE, JOHN DOES 1–4, POLICE OFFICER            :
WILLIAM GONZALEZ, POLICE OFFICER CRYSTAL :
DONES, POLICE OFFICER STEVEN TORRES,             :
:
Defendants.                    :
:
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/9/2022__

LEWIS J. LIMAN, United States District Judge:

Defendant City of New York ("the City" or "Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to partially dismiss the amended complaint (the "Amended Complaint") of plaintiff Carol Lopez ("Lopez" or "Plaintiff") insofar as it asserts claims for municipal liability against the City.  Dkt. No. 64.  For the following reasons, the motion to dismiss is granted.  Because the motion to dismiss is granted, the motion to stay *Monell* discovery pending resolution of the motion to dismiss is denied as moot.

## BACKGROUND

For the purposes of the motion to dismiss, the Court accepts the well-pleaded allegations of the Amended Complaint as true.

### I.    Plaintiff's Arrest

Carol Lopez is a resident of Bronx County, New York.  Dkt. No. 61 ¶ 1.  Defendants Anthony Saline ("Saline"), William Gonzalez ("Gonzalez"), Crystal Dones ("Dones"), and Steven Torres ("Torres") are police officers with the New York City Police Department

("NYPD").  *Id.* ¶¶ 3–6.[1]  These officers are sued in their official and individual capacities.  *Id.*
The NYPD is an agency of the City.  *Id.* ¶ 2.

On February 3, 2019, Lopez was home at her apartment in Bronx, New York.  *Id.* ¶ 13.
At about 8:00 p.m., Lopez's neighbors notified her that the police were assaulting her son
outside.  *Id.* ¶ 14.  When she went outside her apartment building, she observed three uniformed
members of the NYPD—upon information and belief, Gonzalez, Dones, and Saline—punching
and hitting her son in the backseat of a marked NYPD police car.  *Id.* ¶¶ 16–17.  Lopez's son's
legs were dangling out of the police car, and he was screaming for help.  *Id.* ¶ 16.  Upon seeing
this, Lopez yelled out "that's my son!"  *Id.* ¶ 18.  Though Lopez was not involved in any violent,
threatening, suspicious, or illegal activity, one of the police officers who was assaulting Lopez's
son charged toward Lopez and punched her on her head.  *Id.* ¶¶ 19–20.

In response to being punched, Lopez raised her hands above her head with open palms in
order to indicate that she did not have any weapons and had no intention of interfering or
engaging in threatening activity.  *Id.* ¶ 21.  Though Lopez had not resisted arrest or been placed
under arrest, the police officer who punched Lopez in the head ordered her to "stop resisting," *id.*
¶¶ 21–22; upon information and belief, this order was intended to give the false impression to
someone watching body-worn camera footage later that Lopez was, in fact, resisting arrest, *id.*
¶ 25.  Lopez alleges that Defendants deliberately and falsely, and as they were trained to do,
shouted "stop resisting" to create this false impression.  *Id.* ¶ 62.  The other two police officers
who were assaulting Lopez's son then came toward Lopez, and a police officer grabbed Lopez,
slammed her to the ground, and handcuffed her.  *Id.* ¶¶ 27–28.  At this point, the officer who

---

[1] Lopez also names as defendants "John Does 1–4," who are allegedly "adult men employed by
the City of New York as members of the NYPD assigned to the 52nd Precinct of the NYPD, and
whose names are currently unknown to the Plaintiff."  *Id.* ¶ 7.

initially punched Lopez in the head pulled out his gun and pointed it at her. *Id.* ¶ 29. At no time did any of the police officers take any steps to intervene in, prevent, or otherwise limit the conduct of their fellow officers. *Id.* ¶ 46. At all times that Lopez was being beaten by the police, Saline was obstructing his body-worn camera. *Id.* ¶ 26.

Lopez was placed in the back of a police vehicle and transported to the 52nd Precinct's station house where she was held for a number of hours. *Id.* ¶ 31. She was then transported to North Central Hospital in the Bronx to receive treatment for the injuries she sustained as a result of her encounter with the police, *id.*; at the hospital, she remained in the custody of the NYPD, *id.* ¶ 32. Lopez was then transported back to the 52nd Precinct's station house, where she was detained for several additional hours before being transported to Bronx County Central Booking, where she was again held in custody for an additional number of hours. *Id.* ¶ 33. She was eventually released from custody, but she had to return to court at a later date. *Id.* ¶ 43.

Lopez alleges that there was no probable cause to justify her arrest or detention, that she was not involved in any activity that would have justified her arrest, and that it was not reasonable for the police officers to believe that probable cause existed. *Id.* ¶¶ 30, 45. Notwithstanding this lack of probable cause, Lopez was arraigned on a criminal complaint. *Id.* ¶ 34. In support of the criminal complaint, Saline made false allegations that he knew to be false, including allegations that Lopez grabbed Saline and other police officers and pulled them away from her son; that she pushed and shoved Saline and his colleagues and thus obstructed their ability to make a lawful arrest of Lopez's son; and that, when the officers tried to arrest Lopez, she resisted by kicking her legs, flailing her arms, pulling away from the officers, and not allowing her hands to be brought behind her back. *Id.* ¶¶ 34–36. Torres, who arrived at the scene after Lopez's arrest and did not have personal knowledge of the incident, also knowingly

swore out false arrest paperwork. *Id.* ¶¶ 37–38. The accident report Torres authored included a statement that Lopez interfered with an arrest and flailed her arms and pulled her wrists away in order to avoid being placed in handcuffs and also stated that there was no force used on Lopez, *id.* ¶¶ 39, 41, despite there being "wildly excessive force" used on her, *id.* ¶ 65. The accident report did not include a statement that he did not have personal knowledge of the allegations even though such a notation is required in these circumstances. *Id.* ¶ 40. Saline and Torres forwarded the false allegations to the Bronx County District Attorney's Office. *Id.* ¶ 42. Lopez's charges were eventually dismissed pursuant to an adjournment in contemplation of dismissal. *Id.* ¶ 44.

The City has failed to discipline adequately the officers involved in this incident for past false statements and disproportionate violence, thereby endorsing and encouraging the conduct the officers engaged in while violating Lopez's rights. *Id.* ¶ 66.

## II.  NYPD Policies and Practices

Lopez alleges that her arrest and assault "was the result of a longstanding, well-established culture of violence and dishonesty in the NYPD." *Id.* ¶ 48. She also alleges that the NYPD has a culture of using knowingly false statements in accusatory instruments. *Id.* ¶ 49. This culture of lying and corruption has been reported on by journalists and explicitly called out by at least one New York state court judge. *See id.* ¶¶ 50–53. Perjury by NYPD officers has been extensively reported on and spans decades, *id.* ¶ 52, and a complaint filed in another case has alleged detailed histories of NYPD's use of false statements in arrest paperwork and resulting litigation and the NYPD's refusal to change its policies or culture to address this conduct, *id.* ¶ 54. While the custom and policy alleged by Lopez appears to be that NYPD officers practice dishonest behaviors and specifically use knowingly false statements in accusatory instruments, *id.* ¶¶ 48–49, Lopez pleads facts focusing on different aspects of this

alleged "aforesaid unconstitutional customs and practices, specifically with regard to": (1) "the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence," *id.* ¶ 55; (2) "'productivity goals'—which incentivize officers to lie to achieve certain targets," *id.* ¶ 56; (3) "the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct," *id.* ¶ 57; and (4) "the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct," *id.* ¶ 58.

In connection with her allegations of a practice or custom of NYPD officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying evidence, Lopez points to: a report by the Mollen Commission explaining that officers reported "that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them" and that there is a "persistent belief among many officers" in the NYPD that police falsifications are necessary and justified; a 2011 case where an NYPD sergeant pled guilty to perjury and falsifying police records; a perjury charge brought against a former NYPD officer in late 2009, reported in a newspaper alongside reporting that "[p]rosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests"; a 2007 case where an NYPD officer was convicted for accepting money and sexual favors from the proprietor of a brothel in exchange for protecting the brothel; an investigation of the 109th Precinct of the NYPD, reported in a 2008 article, for officers planting drugs on suspects to bring legitimacy to an arrest; a case where two NYPD officers were indicted for felony perjury, filing a false report, and filing a false incident after they, in December of 2009, arrested and falsely swore out charges against an

undercover officer from the Internal Affairs Bureau; an admission by a City attorney that an NYPD officer falsely reported to an assistant district attorney facts that would support an arrest for and accusation of prostitution; and grand jury investigations revealing that over a dozen officers broke into drug dealers' apartments, stole and then sold the drugs, and filed false arrest reports, and associated statements by district attorneys and their assistants that "the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge." *Id.* ¶ 55.

Lopez also alleges that NYPD has "productivity goals" and that these goals incentivize officers to lie and achieve certain targets. As to the existence of productivity goals, Lopez alleges that the Deputy Commissioner of the NYPD has repeatedly admitted that NYPD commanders may set productivity goals, points to statements by NYPD officers—including lieutenants—that officers were directed to make more arrests and write tickets to meet quotas, cites internal memos that instructed officers as to the number of tickets they were expected to issue for traffic violations, and alleges that an arbitrator found that the NYPD maintained an illegal summons quota for traffic violations in one precinct and ordered the City to cease and desist from that practice. *Id.* ¶ 56. Lopez also alleges that officers considered organizing a "daylong summons boycott" because they did not believe it was right to write summonses just to meet a quota but that a Deputy Chief threatened the precinct that was considering the boycott. *Id.* She cites testimony of an NYPD captain that officers are likely to get poor performance ratings if they had few arrests and a jury finding in a state civil case that the police had a quota policy that violated a plaintiff's constitutional rights and contributed to her arrest. *Id.*

Lopez alleges that there are unconstitutional customs and practices concerning the failure to supervise, train, instruct, and discipline police officers, and encouraging the officers'

misconduct.  She points to a 1994 report by the Mollen Commission, which found that the

NYPD's systems for fighting corruption was allowed "virtually to collapse," that "its corruption

control minimized, ignored and at times concealed corruption rather than root it out," and that

there was "a strong institutional incentive to allow corruption efforts to fray and lose priority";

she notes that, in accordance with the collapse of these systems for fighting corruption, the

Office of the Special Prosecutor was abolished in 1990.  *Id.* ¶ 57.  Lopez also points to a

statement by former Police Commissioner Raymond Kelly in response to the decision of a court

in the Eastern District of New York noting a "widespread . . . custom or policy by the city

approving illegal conduct" that such conduct is "not for personal gain" but "more for

convenience."  *Id.*  Lopez cites statistics from the Civilian Complaint Review Board ("CCRB")

from 2002 through 2009 that reflect a relatively high number of misconduct reports that were

either closed without action or discipline, where the NYPD has refused to prosecute the matter,

or where officers were only given verbal instructions or the matter was dropped even though

there was a finding of misconduct.  *Id.*  Lopez alleges that this trend has continued, with "the

NYPD brass . . . recently refusing [sic] virtually any consequences for widespread violent

misconduct during the 2020 protests."  *Id.*

With respect to the alleged "practice or custom of discouraging police officers from

reporting the corrupt or unlawful practices of other police officers and of retaliating against

officers who report misconduct," Lopez cites an undated quote by former New York County

District Attorney Robert Morgenthau that in the NYPD there is a carefully followed "code of

silence" or "code of protection," an acknowledgement in 1985 by a former NYPD Commissioner

that a "code of silence" existed in the NYPD, and a 1991 statement by a different former NYPD

Commissioner that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way." *Id.* ¶ 58.

Lopez alleges that the existence of these *de facto* policies and widespread customs and practices is known to, encouraged, and/or condoned by supervisory and policy-making officials of the City and the NYPD, *id.* ¶ 59, and that they caused many of her injuries, *id.* ¶ 61. She alleges that, "[d]espite years of warnings . . . lawsuits, notices of claim, and CCRB complaints . . . the NYPD has not made a single meaningful change in policy about false statements in arrest paper work [sic], or intentionally misleading practices like shouting 'stop resisting' at non-resisting arrestees to make later observers of body-worn camera footage believe someone was resisting arrest." *Id.* ¶ 60.

## PROCEDURAL HISTORY

Plaintiff initially filed her complaint against the City, Saline, and John Does 1–4 on March 23, 2020. *See* Dkt. No. 1. The City and Saline answered the complaint on August 10, 2020, Dkt. No. 18, and on July 7, 2021, they moved for judgment on the pleadings as to Plaintiff's claims for municipal liability and denial of a fair trial, *see* Dkt. No. 46. Also on July 7, 2021, Plaintiff filed a motion for leave to file an amended complaint. Dkt. No. 49. The Court granted that motion and directed Plaintiff to file her amended complaint no later than January 7, 2022. Dkt. Nos. 50; 59. On January 7, 2021, Plaintiff filed her Amended Complaint, naming as additional defendants Gonzalez, Dones, and Torres. Dkt. No. 61.

The Amended Complaint brings claims against the individual defendants for violations of 42 U.S.C. § 1983 for (1) subjecting Lopez to false arrest and imprisonment in violation of her rights under the Fourth Amendment of the United States Constitution, Dkt. No. 61 ¶¶ 67–72; (2) denying Lopez of a fair trial and violating her right to due process by fabricating evidence and providing prosecutors with a materially false and misleading version of events in violation of

Lopez's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution, *id.* ¶¶ 73–76; and (3) subjecting Lopez to excessive force without legal basis, justification, or excuse and at a level in excess of what was reasonable under the circumstances, *id.* ¶¶ 77–80.  Plaintiff also sues the City pursuant to the *Monell* doctrine for violations of 42 U.S.C. § 1983 for "foster[ing] a lawless atmosphere within the NYPD" for the City's "deliberate[] indifferen[ce] to the risk that the inadequate level of supervision would lead to the violation of individuals' constitutional rights in general, and cause[] the violation of the plaintiff's rights in particular," *id.* ¶ 90, and because "[t]he official policies, practices and customs of the City of New York and the NYPD alleged herein violated plaintiff's rights guaranteed by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the Constitution of the United States," *id.* ¶ 88; *see also id.* ¶¶ 81–91.  The Amended Complaint brings a fifth cause of action for civil rights violations pursuant to New York state law against the individual defendants and the City.

On February 4, 2022, the City filed a motion to dismiss Plaintiff's *Monell* claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 64, and to stay *Monell* discovery pending the resolution of the City's motion to dismiss, Dkt. No. 65 at 10–13.  The Court thereafter denied the pending motion for judgment on the pleadings as moot.  Dkt. No. 66.  On April 29, 2022, Defendants Saline, Dones, Torres, and Gonzalez answered the Amended Complaint.  Dkt. No. 72.  On May 27, 2022, the Court granted a joint request to adjourn the current discovery deadlines *sine die*, with a deadline to be set based on the Court's resolution of the City's motion to dismiss and stay discovery.  Dkt. No. 74.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 557 (2006)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This "does not impose a probability requirement at the pleading stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556. Generally, a complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[A]t the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020)).

"In determining whether to dismiss a claim under [the *Twombly/Iqbal*] standard, the Court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Felix v. City of New York*, 344 F. Supp.3d 644, 652 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). And "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

**DISCUSSION**

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.  Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  "Thus, to hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983); *see also Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Isolated acts "are generally not sufficient to . . . justify municipal liability," except that such acts may be if they are "done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials"—those in policymaking roles—"to such abuses." *Jones*, 691 F.3d at 81; *see also Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 299 (2d Cir. 2020) (explaining that support for municipal liability could be found in "evidence regarding the severity and scope" of the individual employee's misconduct combined with evidence of the awareness of that

misconduct by other employees).  "[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."  *Cotto v. City of New York*, 803 F. App'x 500, 503 (2d Cir. 2020) (summary order) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995)). "Therefore, 'boilerplate language echoing the requirements contained in *Monell*' . . . will not survive a motion to dismiss and Plaintiff must provide detailed factual allegations showing the existence of these alleged policies."  *Barnes v. City of New York*, 2020 WL 6947424, at *7 (S.D.N.Y. Nov. 25, 2020) (quoting *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 302 (S.D.N.Y. 2015)).

　　　"A municipal policy may be pronounced or tacit and reflected in either action or inaction."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).  "The inference that a policy existed may . . . be drawn from circumstantial proof, such as evidence . . . that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had [acted] in violation of the complainants' civil rights."  *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).  Thus, "[i]n order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply constructive acquiescence of senior policy-making officials.'"  *Lucente*, 980 F.3d at 297–98 (2d Cir. 2020) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Jones*, 691 F.3d at 82 (concluding that evidence presented at trial was insufficient as a matter of law to support a reasonable finding that the plaintiff's injury was attributable to a custom, policy, or usage of the municipality where, despite "instances of reprehensible and at times illegal and unconstitutional conduct by individual officers," the

evidence "failed to show sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse" and there was similarly no evidence "that supervisors communicated to officers an attitude of indifference to abuse").  That is, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a city "policy or custom" that is actionable under § 1983.'"  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  Such acquiescence exists, for example, where "notwithstanding the awareness by supervisory personnel of . . . allegations of a pattern of misconduct [that violates rights], no action was taken in response to any of the [allegations]."  *Lucente*, 980 F.3d at 307.  While "proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference," such a showing is not required; "[t]he operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence."  *Amnesty Am.*, 361 F.3d at 128 (quoting *Harris*, 489 U.S. at 389).

There are "a number of different ways in which, given sufficient evidence, [a plaintiff] might have satisfied the burden of showing municipal liability under the standards of *Monell*." *Jones*, 691 F.3d at 82.  "One would be to show a sufficiently widespread practice among police officers of [the complained-of violations] to support reasonably the conclusion that such [violative activity] was the custom of the officers of the Department and that supervisory personnel must have been aware of it but took no adequate corrective or preventative measures (or some combination of the two)."  *Id.*  "Another might be that the officers of the Department

expressed among themselves an inclination to [engage in the complained-of-violations] with sufficient frequency or in such manner that the attitude would have been known to supervisory personnel, which then took no adequate corrective or preventative steps." *Id.* "A third might be a showing of deliberate indifference on the part of supervisory personnel to [the rights violations], which was communicated to line officers so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences." *Id.* Liability for "deliberate indifference" requires "'proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Connick*, 563 U.S. at 61 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). In considering whether a plaintiff has pleaded facts in support of her *Monell* claim sufficient to defeat a motion to dismiss, a court may also consider the time span of the actions alleged. *See Lynch v. City of New York*, 952 F.3d 67, 82 (2d Cir. 2020).

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 196 (quoting *Harris*, 489 U.S. at 388); *see also Parker v. City of Long Beach*, 563 F. App'x 39, 41 (2d Cir. 2014) (summary order) ("*Monell* also recognizes liability where 'a municipality's failure to train its employees . . . amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" (quoting *Connick*, 563 U.S. at 61)). The Second Circuit has articulated "three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* (quoting *Harris*, 489

U.S. at 390 n.10).  "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."  *Id.*  "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  *Id.* at 298; *see also Prince v. Cnty. of Nassau*, 563 F. App'x 13, 16 (2d Cir. 2014) (summary order) (setting forth three-factor test from *Walker*); *Valdiviezo v. Boyer*, 752 F. App'x 29, 31 (2d Cir. 2018) (summary order) (same).

The City contends that Lopez has not stated a claim for municipal liability under either a "custom or practice" or "failure to train" theory of *Monell* liability.  The Court agrees.  Plaintiff alleges her constitutional rights were violated by the individual defendants by her false arrest, denial of a fair trial, and use of excessive force, Dkt. No. 61 ¶¶ 67–80, and the alleged customs or practices at issue for the purposes of Plaintiff's *Monell* claim are thus those that could have given rise to those violations,[2] *see id.* ¶ 88; *see also Harris*, 489 U.S. at 385 ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").  These include the customs and policies alleged by Plaintiffs insofar as they relate to police officers making sworn statements in connection with arrests and prosecutions.

---

[2] The City argues that Lopez does not plead factual allegations that could support a *Monell* claim with respect to custom or practice of the use of excessive force and that Plaintiff's allegations that the NYPD has a "culture of violence" and that the City has not disciplined adequately the officers involved in Lopez's arrest for their use of disproportionate violence are vague and conclusory.  Dkt. No. 65 at 3–4.  In her opposition, Plaintiff does not explain why any *Monell* claim as to excessive force should not be dismissed and instead argues that she has plausibly alleged a "persistent practice of violating the constitutional rights of individuals by . . . engaging in perjury and dishonesty to justify the use of excessive force."  Dkt. No. 70 at 4.  The Court therefore considers Plaintiff's *Monell* claim not to be with respect to use of excessive force but with respect to the alleged making of false statements in accusatory instruments.

Plaintiff has not pleaded facts sufficient to show that at the relevant time the City had a policy or practice by which NYPD officers lie in accusatory instruments and in connection with arrests and prosecutions.  First, most of the specific allegations as to lying in connection with arrests and prosecutions that are set forth in Plaintiff's Amended Complaint concern statements or events that occurred more than (or close to) a decade prior to the events at issue in this case. As then-District Judge Nathan observed in *Barnes v. City of New York*, statements that are nearly a decade old at the time of a plaintiff's arrests, "greatly dilutes the inference that the policy described by the deputy commissioner was operative when Plaintiff allegedly suffered [her] injuries."  2020 WL 6947424, at *8 (S.D.N.Y. Nov. 25, 2020); *see also Lynch v. City of New York*, 952 F.3d 67, 82 (2d Cir. 2020) (explaining that testimony concerning events that occurred in 2004 and were publicly criticized in 2007 may not, viewed in isolation, "be sufficient to state a plausible claim that the City" had the complained-of custom or policy); *Beltran v. City of New York*, 2020 WL 4260990, at *4 (S.D.N.Y. July 20, 2020).  In support of Plaintiff's allegation that there is a "practice or custom of officers lying under oath" and "falsely swearing out criminal complaints," Plaintiff cites a report of the Mollen Commission dating back nearly thirty years, a 1991 report and investigation by "New York Newsday" related to grand jury investigations into "drug-related police corruption" that included "filing false arrest reports," and a relative handful of cases from between 2007 and 2010[3] where individual officers were identified or prosecuted for making false statements.  Dkt. No. 61 ¶ 55; *see also id.* ¶ 57 (stating that the Mollen Commission Report is dated July 7, 1994).  Similarly, in alleging that "productivity goals" exist,

---

[3] The Court considers the relevant year for the allegations with respect NYPD Sergeant William Eiseman to be 2010, when the case number indicates the case was initiated, and not June of 2011, when the Amended Complaint alleges that Eiseman pleaded guilty.  *See id.* ¶ 55.  In any event, the difference is immaterial.

Plaintiff cites articles that were published or report on comments made between 2006 and 2011. *Id.* ¶ 56.

While the Mollen Commission report could, in theory, give rise to a plausible inference that "police falsifications" were at some point widespread, Plaintiff has not alleged facts that would suggest that such widespread lying continued to the relevant time period for this case. *Id.* ¶ 55. Indeed, the allegations she has made with respect to the most recent actions—individual officers engaging in corrupt activity or lying from 2007 to 2010—suggest that such behavior takes the form of relatively isolated incidents that were investigated by the NYPD. *See, e.g.*, *id.* (citing news report that "NYPD Internal Affairs probers" have identified "as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests"); *id.* (citing news report that officers who lied were "snared in a sting by Internal Affairs").

Plaintiff also asserts that she has pleaded a pattern of constitutional violations with respect to herself because she has alleged "that multiple NYPD members swore out false allegations to justify her arrest and assault" and made multiple false allegations in the process. Dkt. No. 70. at 18; *see also id.* at 17–19. But, even if multiple individuals and multiple lies were involved in this single incident, this incident is not the sort of "persistent and widespread practice" that gives rise to the inference that there was a practice or custom of which supervisors were aware and to which they acquiesced and therefore that could give rise to *Monell* liability. *Lucente*, 980 F.3d at 297 (internal quotation marks omitted); *see also id.* at 298 (concluding that actions by a single public employee were sufficiently "persistent" and "pervasive" to sustain a *Monell* claim where "the record was replete with evidence of inappropriate touching and/or other sexual harassment of female inmates on a regular basis by [the employee]" in the same eighteen-month time frame of alleged sexual assaults and sexual harassment of six inmates). "As the

Supreme Court has made clear, 'contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." *Simms v. City of New York*, 480 F. App'x 627, 631 (2d Cir. 2012) (summary order) (quoting *Connick*, 563 U.S. at 63 n.7).

Plaintiff has pleaded no facts that such behavior has persisted over the following decade that would render the incident involving her arrest part of a widespread policy rather than a one-off event, instead simply alleging that, "upon information and belief, the NYPD has not made a single meaningful change in policy about false statements in arrest paper work [sic]."[4]  Dkt. No. 61 ¶ 60; *cf. id.* ¶ 57 (alleging that, with respect to misconduct rooted in violence, "the NYPD brass has continued this trend [of refusing to prosecute misconduct] dramatically, recently refusing virtually any consequences for widespread violent misconduct during the 2020 protests").  Nor has Plaintiff pleaded that the "productivity goals"—something that at least one court in the Eastern District of New York has found to be "not reasonable . . . to equate . . . with malicious prosecutions"—continued past 2010.  *Simms v. City of New York*, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011), *aff'd*, 480 F. App'x 627 (2d Cir. 2012); *see also Simms*, 480 F. App'x at 630 ("[T]he connection between the City allowing its police commanders to set 'productivity goals' and deficiencies in police training that lead to malicious prosecution is far from obvious, and [the plaintiff] makes no effort to delineate the connection in his Complaint or in his briefs on appeal.").

---

[4] Plaintiff also alleges that the NYPD has not made a meaningful change in policy about "intentionally misleading practices like shouting 'stop resisting' and non-resisting arrestees to make later observers of body-worn footage believe someone was resisting arrest."  Dkt. No. 61 ¶ 60.  Plaintiff alleges that the defendants were trained to shout "stop resisting," *id.* ¶ 62, but offers no facts in support of this allegation.

Second, and as multiple courts in this District have explained in cases alleging substantially similar customs or policies, "[c]iting various lawsuits alleging police misconduct in various contexts alone is insufficient to plead the existence of municipal policies." *Beltran v. City of New York*, 2020 WL 4260990, at *4 (S.D.N.Y. July 20, 2020); *Barnes*, 2020 WL 6947424, at *8 (dismissing *Monell* claim despite allegations "that the presence of numerous other lawsuits in the district alleging the same or similar policies shows that the City in fact has such policies"). Plaintiff cites to such lawsuits here, alleging that "the complaint in *Case v. City of New* York . . . documents at great length the history of NYPD using false statements in arrest paperwork, litigation about those false statements, and the NYPD's total refusal to change its culture or policies to address it." Dkt. No. 61 ¶ 54. To be sure, this does not mean that such allegations may not be probative of a municipal policy or may not help a plaintiff's complaint defeat dismissal when coupled with other allegations, *see Lynch*, 952 F.3d at 81–82, but it does mean that a complaint's citations to mere allegations of a municipality's engagement in an illegal policy "would likely not suffice on their own as plausible indicia that the [complained-of practice]" occurred in the relevant timeframe, *id.* at 82.

Plaintiff has not pleaded allegations that could, either in isolation or in combination, permit a plausible inference that the NYPD has a custom or policy of widespread, unchecked lying by police in connection with filling out accusatory instruments. This is not a case where such a policy could be inferred by a combination of dated statements and allegations of significantly similar conduct—including allegations of conduct by the same decision-making bodies—in recent complaints. In *Lynch v. City of New York*, for example, the Second Circuit held that a plaintiff had sufficiently pled a *Monell* claim when he made allegations that he had been arrested pursuant to a "False Observation" practice under which officers made false

statements regarding their observations of demonstration-related arrestees and the circumstances of those demonstrators' arrests.  The *Lynch* complaint alleged that "[a]rresting officers ha[d] been told—on a number of prior occasions by attorneys within the NYPD's Legal Bureau—to lie that they had 'personally observed' a demonstration-related arrestee do certain acts, when the arresting officer had never personally observed the arrestee do those acts."  *Id.* at 80.  The plaintiff alleged that his arrest—made in 2015 at a demonstration and where the summons issued contained false statements as to the issuing officer's observations—was made pursuant to this False Observation policy.  The Circuit vacated the district court's dismissal of the plaintiff's *Monell* claim, explaining that the complaint was sufficient to allege that the False Observation resulted in the plaintiff's 2015 arrest in light of sworn testimony that the False Observation practice existed in 2004 and in light of allegations in other lawsuits that it continued until at least three years before the plaintiff's arrest.  *Id.* at 82.  Here, by contrast, Lopez does not point to any sworn testimony that an NYPD policy ever existed or cite to cases alleging the same specific policy applied to a similar set of facts or plead any other facts that could plausibly permit the inference that any policy lasted until the time of her arrest in 2019.

Similarly, the Court does not afford weight to the decision by Judge Weinstein in *Cordero v. City of New York*, 282 F. Supp. 3d 549 (E.D.N.Y. 2017), cited and ostensibly incorporated by reference into the Amended Complaint, to allow a plaintiff to proceed against the City on his *Monell* claim alleging that "the failure to take reasonable steps to control lying by police officers is a policy of the NYPD."  *Id.* at 555.  Judge Weinstein was presented with a different complaint with different allegations and a different—and notably more specific— alleged custom and policy: that "the police department has long been aware of a wide-spread practice of false arrests at the end of tours of duty in order to obtain overtime and that it has

failed to sufficiently address this practice." *Id.*  Plaintiff's "citation of an unrelated action, in which another district court addressed the sufficiency . . . of a separate complaint premised on a different set of factual allegations, does not support an inference that [Plaintiff's] injuries were caused by the" alleged customs or practices, particularly given that there was no a finding of fact that the City employed the alleged customs or practices.  *Simms*, 480 F. App'x at 630.

Because Plaintiff has not pleaded facts that would suggest a widespread practice of police officers lying in accusatory instruments that existed at the time of her arrest, her *Monell* claim fails.  But even if Plaintiff had pleaded such facts, she has not pleaded facts that would suggest the City did nothing in the face of a pattern of officers lying in accusatory instruments and thus "acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Reynolds v. Guliani*, 506 F. 3d 183, 192 (2d Cir. 2007).  Plaintiff alleges that, despite "years of warnings," "the NYPD has not made a single meaningful change in policy about false statements in arrest paper work[sic]."  Dkt. No. 61 ¶ 60.  To the extent that "policy" in this allegation can be read to mean that the City has not taken *any* action to address such wrongdoing—whether pursuant to a change in official policy or another action—this allegation is belied by the specific factual allegations of Plaintiff's Amended Complaint.  Plaintiff repeatedly alleges that the Internal Affairs Bureau of the NYPD affirmatively investigated officers who were making false statements, including by setting up a "sting" operation to uncover such wrongdoing.  *Id.* ¶ 55.  Such allegations do not support a showing "that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had [acted] in violation of the complainants' civil rights" and thus undercut "[t]he interference that a policy existed."  *Riccuiti*, 941 F.2d at 123.

Moreover, many of the allegations in Plaintiff's Amended Complaint not only suffer from the same temporal defects noted above but also refer to alleged general dishonesty and

corruption by NYPD officers and not the specific alleged custom or policy that could have given rise to Plaintiff's injuries—that is, a custom or policy related to making false statements in accusatory instruments. *See, e.g.*, Dkt. No. 61 ¶ 58 (alleging that the "practice or custom of discouraging police officers from reporting the corrupt or unlawful practice of other police officers and of retaliating against officers who report misconduct" is supported by an undated statement and statements made in 1985 and 1991 about the "code of silence" or "blue wall of solidarity with its . . . silence"); *id.* ¶ 50 (quoting a New York State Supreme Court Justice as saying in 2011 and in reference to a police officer who planted drugs on suspects that he was "shocked, not only by the scope of misconduct, but even more distressingly by the seeming casualness by which such conduct is employed"). Such generalized allegations of "misconduct," "corruption," and "dishonesty" are far too broad to permit an inference of a custom or policy that could plausibly have given rise to Plaintiff's injuries.

Plaintiff's "failure to train or supervise claim" similarly fails. In "'limited circumstances,' municipal liability may be based on a municipality's . . . failure to train, supervise, or discipline subordinates, if 'the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality can be found deliberately indifferent to the need.'" *Pettiford v. City of Yonkers*, 2021 WL 2556172, at *6 (S.D.N.Y. June 21, 2021) (alteration adopted) (quoting *Reynolds*, 506 F.3d at 192). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

As noted above, the Second Circuit has set forth three prerequisites to finding that inaction by a municipality constitutes deliberate indifference. The City argues that the second requirement—that "the situation either presents the employee with a difficult choice of the sort

that training or supervision will make less difficult or . . . there is a history of employees mishandling the situation," *Walker*, 974 F.2d at 297—has not been alleged.  "Implicit in *Walker*'s second requirement is that a municipal actor must have disregarded a *known or obvious* consequence of their inaction."  *Pettiford*, 2021 WL 2556172, at *6.  "Additionally, a plaintiff must allege that despite an obvious need to act, the municipality made 'no meaningful attempts' to forestall future constitutional violations."  *Id.* (quoting *Tieman v. City of Newburgh*, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015)); *see also Tieman*, 2015 WL 1379652, at *21 (explaining that, "to raise an inference of deliberate indifference due to failure to supervise," "a plaintiff must allege that meaningful attempts to investigate repeated claims of excessive force are absent" (internal quotation marks and citation omitted)).  For the same reasons that Plaintiff has failed to plead a custom or policy of the City that would be sufficient to sustain her *Monell* claim, she has failed to plead the deliberate indifference required for a failure to train or failure to supervise claim.  Plaintiff has merely alleged, in a conclusory manner, that her injuries are a result of the City's failure to train or supervise NYPD officers to prevent their making false statements in accusatory instruments; she has pleaded no facts that could give rise to an inference the City took no action in response to any complaints, instead pleading that the City did work to address any such complaints through the NYPD's internal affairs bureau.

Because Plaintiff has not pleaded facts giving rise to the City's liability for the individual defendants' alleged violations of Section 1983, her *Monell* claims must be dismissed.  In light of the dismissal of these claims, the pending motion to stay *Monell* discovery is denied as moot.

**CONCLUSION**

The motion to dismiss Plaintiff's *Monell* claim against the City is GRANTED, and the claim is dismissed with prejudice.  The motion to stay discovery is DENIED as moot.

The Clerk of Court is respectfully directed to close Dkt. No. 64.

SO ORDERED.

Dated: June 9, 2022
      New York, New York                                LEWIS J. LIMAN
                                          United States District Judge